**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 12 1997**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

Craig Bryan Northington; David
Montoya; and all other inmates similarly
situated,

      Plaintiffs-Appellants,

v.

Robert Furlong, Warden; Richard Marr,
Assistant Warden; Al Estep,
Administrative Officer III; L. Nutter,
Capt., Endre Samu, Lt., W. Sommers,
Lt., AAHB Hearing Officers; G. Butler,
Sgt., S. Bergman, Correctional Officers;
Sgt. Hostetler, Correctional Officer;
John Doe #1, Supervisor, Colorado
Department of Corrections; Laurel J.
Farrell, Drug Test Unit Supervisor;
Cindy Silva-Burbach, Lab Technician,
Colorado Department of Health; and all
other persons presently unknown,

      Defendants-Appellees.

No. 96-1260
(D.C. No. 95-B-1029)
(D. Colo.)

---

**ORDER AND JUDGMENT**[*]

---

[*]The case is unanimously ordered submitted without oral argument pursuant to
Fed. R. App. P. 34(a) and 10th Cir. R. 34.1.9. This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel. The court generally disfavors the citation of orders and judgments;
nevertheless, an order and judgment may be cited under the terms and conditions of 10th
Cir. R. 36.3.

Before **BRORBY**, **EBEL** and **HENRY**, Circuit Judges.[**]

Plaintiffs Craig Bryan Northington and David Montoya appeal from the district court's grant of summary judgment in favor of Defendants, a number of prison officials at the Limon Correctional Facility ("LCF") in Limon, Colorado. We have jurisdiction under 28 U.S.C. § 1291, and now reverse in part and affirm in part.

## Background

Between October 1, 1993, and April 15, 1995, prison officials asked Plaintiffs, who are prison inmates, to produce a number of urine samples for drug testing. In some cases, Plaintiffs were unable, or unwilling, to do so. In these cases, Plaintiffs were charged with the Code of Penal Discipline violation of Refusing to Obey a Lawful Order. In two other instances, the samples tested positive for drug use. Plaintiffs underwent disciplinary hearings and were convicted of penal code violations. As a result of their convictions, their visiting privileges were temporarily suspended. They also lost good time credit and were temporarily placed in punitive segregation.

---

[**]After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1.9. The case is therefore ordered submitted without oral argument.

- 2 -

Northington and Montoya filed a pro se complaint alleging a variety of constitutional claims centering on the urine testing and the resulting disciplinary charges. In substance, the plaintiffs alleged the testing was harassing, racially discriminatory, conducted in retaliation for prior lawsuits brought by the Plaintiffs against some of the defendants, and unconstitutionally non-random. The district court referred the case to a magistrate judge, who recommended granting Defendants summary judgment. The magistrate judge essentially found Plaintiffs suffered no constitutional deprivation and that Defendants were entitled to qualified immunity. The district court adopted the magistrate judge's recommendation.

### Discussion

We review the district court's grant of summary judgment de novo. Wolf v. Prudential Ins. Co., 50 F.3d 793, 796 (10th Cir. 1995). Summary judgment is appropriate when there is no genuine dispute over a material fact and the moving party is entitled to judgment as a matter of law. Lucero v. Gunter, 52 F.3d 874, 877 (10th Cir. 1995). In reviewing the record, "[w]e view the evidence and draw any inferences therefrom in the light most favorable to the party opposing summary judgment." Id.

We find the magistrate judge's recommendation, which was adopted by the district court, did not address all of the issues raised by Northington and Montoya.

Specifically, it did not address the claim that the urine testing of program was not "truly random," in violation of Lucero, 52 F.3d 874. In Lucero, we stated:

> [A]lthough random urine testing of inmates does not violate the Fourth Amendment, . . . the procedures for selecting inmates for testing must be truly random. . . . Selection procedures are not truly random and thus violate the Fourth Amendment when the procedures leave the "exercise of discretion as to selected targets in the hands of a field officer with no limiting guidelines."

Id. at 877 (citations omitted).

The legal standard in this case thus is clear: the defendants are entitled to subject Northington and Montoya to drug tests only so long as the drug tests are truly "random" under the requirements set forth in Lucero, 17 F.3d at 1350. So long as a prisoner offers some evidence raising a genuine factual dispute as to the randomness of the tests, the burden then shifts to the government to establish the randomness. Lucero, 52 F.3d at 877 ("[W]e conclude the government has demonstrated that the urinalysis request in question was based on random selection." (emphasis added)).

To survive a motion for summary judgment, the evidence before the district court must be "such that a reasonable jury could return a verdict for the nonmoving party." Vitkus v. Beatrice Co., 11 F.3d 1535, 1539 (10th Cir. 1993) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 250-51 (1986)). In this case, Northington and Montoya have offered detailed, specific evidence that they have been drug tested more often than the typical inmate at LCF, that the

frequent drug testing to which they have been subjected is in retaliation for lawsuits filed against prison officials, and that the drug tests thus were not "truly random." We find this evidence is sufficient to defeat Defendants' motion for summary judgment.

In Montoya and Northington's Verified Response to Defendants' Motion to Dismiss or for Summary Judgment, Montoya detailed the series of urine tests to which he was subjected and the circumstances in which those tests were allegedly conducted. Montoya claims that in early January 1994, approximately ten days after filing a state court complaint against Defendant Furlong, "he was arrested by security officer [*sic*] at LCF and taken to Defendant Bergman who then ordered Montoya to provide a urine specimen claiming that it was being ordered as a 'follow-up' by the Shift Commander." (Verified Response to Defendants' Motion to Dismiss or for Summary Judgment at 15-16, R.O.A. Tab 62.)

Approximately fours weeks after this test, Montoya was again ordered to provide a urine specimen. "When Montoya complained stating that other inmates weren't being subjected to constant urinalysis who also had been convicted in disciplinary hearings for possession or use of dangerous drugs, Defendant Butler responded that it didn't matter how other inmates were treated and that Defendant Butler could require Montoya to provide and be subjected to UA's whenever he felt like it for no reason or any reason at all." (Id. at 18)

In June 1994, after several more tests, Montoya was subjected to another drug test, which was administered by Defendant Hostetler. "When Montoya asked Defendant Hostetler why he was being constantly required to give urines [*sic*], Defendant Hostetler replied that he didn't know why other than the <u>order came from the Shift Commander</u>. Defendant Hostetler then informed Montoya that he wasn't the only inmate who was being <u>singled out</u> for such treatment. Defendant Hostetler then stated to Montoya that Northington was also being subjected to constant urinalysis because of Northington's lawsuit against officers in the facility." (<u>Id.</u>) (emphasis added)

Montoya tested positive for cannibinoids on December 10, 1995. At a hearing held on January 9, 1995, Montoya challenged the test, claiming it was a false positive. Defendant Samu, who was then a defendant in a separate civil action brought by Montoya, served as the hearing officer and presented the prison's case against Montoya. Montoya was not permitted an Inmate Representative, and was not provided a copy of the completed urinalysis checklist which he claimed would support his theory that proper testing procedures had not been followed and that the test results thus were not reliable. (<u>Id.</u> at 21)

In his affidavit, which was attached to the verified brief in opposition to summary judgment, Montoya made additional specific allegations. For instance, Montoya described a situation where he served Defendant Samu with a complaint

on behalf of Inmate Rudy Archuleta after obtaining a pass into the hearing room where Samu was serving as a hearing officer. "Mr. Samu jumped out of his chair in a threatening manner yanking the pass out of my hand and then yelling at me about being a [*sic*] inmate and having no rights when it came to him. I then attempted to apologize stating that I had permission to bring the papers to him when Mr. Samu became very hostile telling me that he would remember me in the future and then ordered me to leave the hearing room before he found some reason to put me in the 'hole.'" (Montoya Affidavit, R.O.A. Tab 63 at 11)

Further, Montoya stated that "almost immediately" after filing a complaint in state court against Defendants Furlong and Samu, "I was arrested and ordered to provide a urine sample with the statement by Sgt. Bergman that it was being done in relation to getting my visits back which later proved to be untrue. Then <u>in approximately ten-months I was required to provide at least seven urine specimens</u> none of which I was ever informed screened positive for drugs." (<u>Id.</u> at 13 (emphasis added))

Like Montoya, Northington has also adduced sufficient evidence that the urine testing to which he was subjected was not random. In the verified response in opposition to summary judgment, Northington alleged that the conflict between defendants and Northington began after a January 28, 1993 incident at LCF during which a correctional officer was stabbed by a Hispanic inmate.

Northington served as the inmate representative for several Hispanic inmates in hearings arising out of that incident. (Verified Br. in Opposition at 4, R.O.A. Tab 62). After a disciplinary hearing on February 5, 1993 during which Northington served as the inmate representative for Joseph Medina, defendant Samu "had Northington arrested and taken to the office of the facility investigator, Dennis Hougnon. Dennis Hougnon then informed Northington that it was his intent and the intent of all officers and the administration of LCF to retaliate against Northington for representing these minority inmates, and against the general inmate population as a whole for the attack on correctional officers and until which time it was discovered what Mexican inmate stabbed Officer Combs." (Id. at 5) Later, Defendant Hostetler told Montoya that Northington was being subjected to constant urinalysis because of his representation of other inmates in litigation against LCF prison officials. (Id. at 18)

On January 28, 1994, Northington contacted Defendant Furlong regarding the status of a disciplinary proceeding involving Inmate Troy Sharpe, whom Northington had represented. Furlong told Northington he would look into the matter. The next day, at approximately 8:30 a.m., Northington was "arrested by security officers and taken to the Receiving Unit where he was placed in a holding cell with Inmate Sharpe. Defendant Bergman then gave both Northington and Inmate Sharpe a direct order to provide a urine specimen within one hour or

face disciplinary action. Northington then informed Defendant Bergman that he was currently under medical care for intestinal and urinary infections and . . . requested that Defendant Bergman provide some hot fluids if possible and/or to allow Northington to sit on the toliet [*sic*] to prevent Northington from defecating on himself which he was doing in attempting to provide the urine specimen." Bergman denied both of these requests, and Northington was unable to urinate. (Id. at 28) On February 10, 1994, Captain Jarvis informed Northington that the January 29 test was not the result of a random computer selection. (Id. at 30)

Northington was again tested on March 15, 1994, (Id. at 33) as well as on June 1, 1994. (Id. at 36) Defendant Nutter was initially seated as the hearing officer for the disciplinary hearing regarding Northington's failure to urinate for the January 29, 1994 test. Northington objected to Nutter's serving as the hearing officer, because in the summer of 1993 Nutter had told Northington that if he "ever wanted to retaliate against Northington . . . he would order Northington to be UA'd and that the results would come back positive. Since Northington did not use drugs, he understood this statement by Defendant Nutter as informing him that he or someone else would tamper with Northington's urine specimen." (Id. at 31) After Northington's objection, Nutter was replaced by another hearing officer.

On July 28, 1994, after returning to LCF from a court appearance in Denver for <u>Northington v. Zavares</u>, another lawsuit he had filed against LCF officials, Northington "was arrested by Capt. Waide without explanation [*sic*] and placed in full body retraints [*sic*] and in a dry cell under 24-hour observation." Northington asked Waide why he had been arrested, and Waide did not answer. Northington then "informed Capt. Waide that he believed Capt. Waide was retaliating against him for filing suit against several officers in the federal court . . . . Capt. Waide did not deny Northington's allegation." (<u>Id.</u> at 36) At a subsequent hearing in <u>Zavares</u>, prison officials offered inconsistent explanations as to why Northington was dry celled on July 28, 1994. (<u>Id.</u> at 38-39)

The July 28, 1994 urine sample tested positive for marijuana. At a subsequent hearing regarding that test, Defendant Farrell testified that no one from the Drug Test Unit could testify that the drug test results were accurate. (<u>Id.</u> at 42)

Northington was tested again on November 15, 1994, and December 15, 1994. During the December 15, 1994 test, Northington complained to Defendant Hostetler that he had been tested one month earlier, and had not yet received the results. "Defendant Hostetler replied by asking Northington whether he had 'pissed off Capt. Nutter lately.' When Northington answered that he had just recently filed suit against Defendant Nutter in State court, Defendant Hostetler

replied that it was Defendant Nutter who had ordered Northington UA'd informing Defendant Hostetler to mark the lab slip 'reasonable suspicion' even though Defendant Hostetler could not articulate to Northington what that alleged 'reasonable suspicion' was." (Id. at 46)

Based on these specific factual allegations, offered under oath, we believe there is a genuine issue of material fact as to whether the urine tests to which Northington and Montoya were subjected were "truly random" under Lucero. We therefore conclude that the district court erred in granting summary judgment.

Additionally, we are persuaded that Northington and Montoya made an adequate objection under Fed. R. Civ. P. 56(f) to the defendants' motion for summary judgment on the basis that they had not yet had the opportunity to conduct essential discovery. (See Verified Response at 7, 9, 61; Objections to Magistrate's Recommendation, R.O.A. Tab 64, at 64). Although Northington and Montoya do not expressly cite to Rule 56(f), they expressly state that summary judgment should not be granted against them at this time because they have not yet had the opportunity to conduct essential discovery. They go on to identify with some precision what further discovery would be useful. Although pro se defendants have to comply with the federal rules, we believe that their verified statements in opposition to the defendants' motion for summary judgment satisfy

the requirements of Rule 56(f). See Thomas v. Turner, 30 F.3d 142 (Table), 1994 WL 363540 (10th Cir. 1994).

Northington and Montoya additionally contend that the magistrate and district judges failed to consider their argument that the drug tests were in and of themselves violations of their constitutional rights, regardless of whether they satisfied Lucero's "truly random" requirement. This argument is without merit. Urine testing is a long-accepted method of enuring prison security, e.g., Lucero, 17 F.3d at 1350. Thus, the mere fact that urine tests were conducted does not amount to a constitutional violation, so long as the tests were conducted randomly.

Finally, Northington and Montoya argue that the urine testing program was conducted in a racially discriminatory manner. However, their only allegations regarding this claim are entirely conclusory, and conclusory allegations are not sufficient to survive summary judgment. See Setliff v. Memorial Hosp., 850 F.2d 1384, 1392 (10th Cir. 1988).

## Conclusion

For the foregoing reasons, the district court's grant of summary judgment in favor of the defendants REVERSED with regard to Northington and Montoya's claim that the drug testing program was conducted in an impermissibly non-random manner. However, the district court's grant of summary judgment is

AFFIRMED with respect to all other claims.  Accordingly, the case is

REMANDED to the district court for further proceedings consistent with this

opinion.

ENTERED FOR THE COURT

David M. Ebel
Circuit Judge